Please call the next case. 312-0470 Donald French. Counsel, you may proceed. May it please the court, my name is Mark Wilson. I represent Donald French in this case. Mr. French was injured in a work accident that occurred on September 21st of 2007. At the time, he was working as a machine operator when he had a fall, causing his left shoulder to strike an I-beam. Mr. French ultimately underwent two left shoulder surgeries and a cervical fusion. Now, the two left shoulder surgeries were not disputed. They were accepted. But the cervical fusion procedure was disputed. A hearing was held before the arbitrator with regard to causation of the cervical condition and the need for the fusion to the work accident question. The arbitrator found that there was no causation between the cervical condition and the need for the fusion in the work accident question. Likewise, the arbitrator found that as of June 24, 2009, that no further TTD benefits were owed. And that was based upon the respondent's IME physician, Dr. Cohen, who had indicated at that time that when it came to the shoulder that Mr. French was able to return to work. He attributed any need to be off work after that date to the cervical condition. Now, the arbitrator also denied payment of the medical bills related to the cervical condition. There also is a dispute as to the average weekly wage. These findings were affirmed by the commission and by the circuit court. Now, it's our position that these findings are against the manifest weight of the evidence. With regard to the causation between the neck and the September 21, 2007, work accident, I went to great lengths in my brief to cite the various parts in the medical records in which there was complaints of neck pain documented. And I'm not going to go through each of them because it is set forth thoroughly in the brief. But suffice it to say, from the very first incident report of September 25, 2007, there was complaints of neck pain. Additionally, the very first visit, likewise, there was complaints of neck pain and radiating pain down the upper extremity. Now, Counsel, didn't both Drs. Cohen and Delheimer opine that the conditions of the claimant's cervical spine were unrelated to the job accident? That is true, Your Honor, and my position on that, Your Honor, is when you take into totality the evidence and you consider their opinions that their opinions are unreasonable and they're against the manifest weight of the evidence. Why is that? Well, with regard to Dr. Delheimer, he did not even have the cervical MRI, for one. He didn't even review that. He indicates that clearly in his report, and that's a big deal here. He also said that there was no indication of any cervical radiculopathy symptoms, but yet there's all these diagnoses and mentioning of neck pain and radiculopathy, even leading up to, if you look at, Your Honor, November 24, 2008, there was mention of neck pain and radiculopathy. Additionally, Your Honor, what I thought was very important, just focusing on Dr. Delheimer for now, Dr. Delheimer said that he did believe that he had a soft tissue injury that would have healed up as of eight weeks post-accident. And if we go eight weeks post-accident, that comes to the date of the IME, oh, I'm sorry, the MRI that was done on November of 2007, and the findings of that MRI indicated findings of the C5-C6 level and protrusions that ultimately ended up being what the fusion was performed on at those levels. And additionally, Your Honor, with regard to Dr. Delheimer, he did not have the benefit of reviewing all these records after that date that he saw him in 2008. Who were the two doctors that treated the claimant for the cervical spine condition? The, well, the main doctor for the cervical spine was Dr. McElroy, McElroy. He did the, he performed the surgery, however, he did not see him until about, you know, a year and a half after the accident. The other doctor that saw him, the treater, was Dr. Howard, and Dr. Howard was a pain management physician. And one of the things that seemed to be disregarded by the arbitrator and the commission and the circuit court was they, Dr. Howard indicated in that one particular record that if Mr. French had no symptoms before this accident, had no history of any cervical complaints before the work accident in question, that he would attribute the complaints and the treatment he was providing him to the work accident in question. But the point is, none of the doctors ever specifically gave a causation opinion, did they? Well, Dr. Eilers did. Dr. Eilers is an IME physician who gave his evidence deposition and indicated that whatever preexisting condition he had, that it was clearly aggravated by the accident and continued up until the time of the surgery. And I think that the, when we look at the records, that that clearly, you know, is, the evidence bears that out. And I think to say that, just to go and say, well, there's an opinion out there that denies causation. Well, there's two opinions out there, right, that deny causation. Well, I didn't talk about Dr. Cohen's yet, but Dr. Cohen's, the reason why I do not think that his opinion should be given any weight on it is he is just mimicking Dr. Delheimer's opinion with regard to the neck. He only saw him with regard to the shoulder. And Dr. Cohen is an upper extremity physician, and he indicates in his records, he's just saying, he's citing what Dr. Delheimer says, he performs no independent examination of the neck. And also, he doesn't even, he, if you look at his report, he doesn't even have Dr. Mulconry's records. He's saying that the, Mr. French is telling me that he's going in for this, or he's, the doctor apparently wants to do this. Like, he doesn't even know anything going on with the cervical condition. Even if you accept all that, what you've just said, we still have a situation where an employer has an IME who says no causation. You have an IME who says there is causation. No treater renders a causation opinion. The commission chooses to believe the opinion of the employer's IME. So it's, you know, the law is pretty clear. The commission has the authority to choose between competing medical opinions, and that's where we are. I understand, Your Honor. What I would throw in is just, again, it seems like Dr. Mulconry, or I'm sorry, Dr. Howard's opinion within his record is not being considered. And I do think that. Doesn't he really, though, just say that in the history that the claimant attributes his neck problems to? No, it wasn't in the initial history. It was a little further on. He says that August 27, 2008, his records, he says, that if for any reported neck or headaches, pain symptoms prior to a shoulder injury, would have to attribute his headache and neck pain symptoms to the same injury in which his shoulder was involved. And to me, there's nothing, there is no prior history. So, I mean, in retrospect, I would have taken his deposition, but I didn't think that it was necessary at the time because there was no history of a prior injury, and there was everything that started right from the date of the first incident report all the way up to now. However, the arbitrator noted that specific statement and said that general statement is not a causation opinion, and that was adopted by the commission, right? I agree that that is what it says, but I disagree that that's correct. And also, what I would say is just, actually, because the circuit court judge said the same thing to me. He said, you know, Mr. Wilson, how do I get around the fact that there's a doctor that's saying that there's no causation? And just my response to that is if the basis of that opinion is unreasonable and against the weight of the evidence, then it should be disregarded as if there was no opinion there. That's just my response to it. And I think that clearly the opposite conclusion is apparent here when you consider things from the date of the accident all the way up to the date of the surgery, because it really is consistent. And also, when you look at the findings on the MRI that were eight weeks post-accident, and it talks about a protrusion at C5-6, and that ultimately ends up being the surgical level where it was performed at, I mean, to me that is against the manifest way of the evidence to find otherwise. When it comes to the TTD issue, the arbitrator ruled against us on that because of finding the no causation with the NAF. So it's our position, of course, that that should be tied into this, and he should be getting the TTD benefits up to the date of arbitration. But another thing that is important for me to throw in with regard to the TTD issue is, even if it would be found that the cervical condition is not causally related, Mr. French still had permanent restrictions on him that were given to him with regard to the shoulder by Dr. Lee, who was the doctor who did the two shoulder surgeries. So I would argue that the benefits should have been continuing up to the date of the arbitration hearing based upon that. And likewise, with regard to the bills, the bills were denied with regard to the cervical condition, and if you find causation in the cervical condition, the bill should be paid as well. Now, with regard to the wage issue, I cited the Graney case in there, and just to be completely honest with the court, the reason why I thought that the way that the Graney case looked at the wage was correct was because in the Graney case, it looked at the Smith case, and it considered the Smith case, which was like a 1988 case, and it indicated that it was proper to follow this formula, this particular formula. And I kind of put forth it's like a math equation. I put it in my brief, and my argument is just that the Graney case should be followed with regard to the wage issue. Thank you. Thank you, Counsel. May it please the Court. Good afternoon, Your Honors. My name is Matt Brewer. I'm here today on behalf of the Respondent Oak State Products. As Counsel had discussed, all of our issues here today in regards to causation, TTD, the medical, and even the average wage are a manifest weight issue, and in particular, obviously, we're talking about the cervical spine. And if I can, I want to start with Dr. Delheimer's examination, and that took place in October of 2008. Now, there has been some discussion of records, which occurred both before and after Dr. Delheimer's exam itself. Dr. Delheimer had everything he needed up through the date of his exam. He's got his MRI. You would agree, though, won't you, Counsel, that the medical records did show a consistent complaint of pain in the neck after this accident? I agree with that, Your Honor. As a matter of fact, Counsel set it forth in his brief. And there's also, I mean, there's no indication of anything else that would have caused his disc that he ended up having to have a cervical fusion. Correct, but I think if you look at Dr. Delheimer's report in particular and you look at how this is laid out in Counsel's brief, all of these complaints are subjective. When we get to our objective medical evidence, when we get to our MRI, when we get to our EMG, it's not correlating. You know, we have subjective complaints, but we have just mild degenerative disc disease. We have no spinal cord compression. We have no compromise of the cord. We're not seeing any impingement. We're not seeing a reason, a cause for these symptoms that he's experiencing. The EMG itself says that the C7 radiculopathy was patchy at best, which even the radiologist's report stated that that's not diagnostic. And as a result, Dr. Delheimer, I know, attributed it to possibly some left cubital tunnel or some cubital tunnel syndrome, which was not related to the accident. There was no trauma to the elbow or anything like that of that nature that would cause those types of symptoms. And I think, lastly, in particular addressing those complaints, I frankly think when you take a look at the record, the complaints are brought into question a little bit by the FCE. I mean, they were showing, you know, inconsistent responses. We have inconsistent heart rate. We've got invalid testing. We've got submaximal effort. I mean, it seems to be as though we're trying to make our symptoms something maybe more than they really are. I think the fact that the subjective complaints don't match with the objective findings, at least up through Dr. Delheimer's report, makes it a very reasonable assertion for a soft tissue injury, which obviously was his opinion. Now, obviously, you know, we go on to invalidating Dr. Delheimer's opinion because the complaints continue on after the examination itself. As I just expressed, the MRI and the EMG are very clear. And I think if you compare the MRI, we have the EMG showing possible radiculopathy at C7. But we don't have a lot of damage, if any damage, above normal degenerative changes on that level at the MRI. The MRI and the EMG don't seem to compare in that regard. And I think that also points to Dr. Delheimer and his opinion of simply a soft tissue injury. Now, there is some, you know, talk about Dr. Delheimer, you know, being a higher gun, being an IME physician, and his opinions should be looked in that context. But as we've discussed here today, Dr. Eiler's opinion, he is an examining physician himself. And I think if we're going to look at Dr. Delheimer's opinions in the context of an examining physician, I think we have to do the same exact thing with Dr. Eiler's. Now, additionally, we've discussed how the treaters did not give any opinions. We have a statement contained in Dr. Howard's records that if there's no complaints, then perhaps it's related. But I think if you look at that statement that Dr. Howard makes closely, he's saying that the pain and the symptoms that the petitioner is experiencing ongoing could be related. Dr. Howard, you know, he doesn't really get into any of the objective findings. And we've discussed here today that those subjective complaints, you know, may or may not have any validity at all based upon the objective evidence contained to this gentleman's cervical spine. Now, additionally, as you know, Dr. Howard's deposition was not taken. So he makes this kind of general statement, this kind of, you know, informal statement within his records. We can't address what treatment Dr. Howard thought may have been needed for the cervical spine. We don't know Dr. Howard's opinion of what the nature and maybe the extent of the injury could have been. He said, this guy's got pain. It may or may not be related. And as the commission stated, I don't think it's unreasonable. That's not, I guess, enough of a causation opinion, you know, at least to present evidence as such. Now, I would like to also address Dr. McHenry. As you know, he is the treating physician as far as the surgeon for the cervical spine. I think it's very noteworthy that Dr. McHenry issues no opinions either in his records, and obviously his deposition is not taken. I think to a certain extent that gives somewhat of a negative inference as to what Dr. McHenry may or may not have said. A treating physician, I think, is naturally going to in some extent agree or side with the patient, and there is no opinion to that regard in this case. Now, we talk about Dr. Cohen. He sees the petitioner twice, and he agrees. He backs up Dr. Delheimer's opinion. Now, we argue that Dr. Cohen is an upper extremity specialist. He's not a spine doctor. He's not a neurologist. However, Dr. Ehlers is not a spine surgeon, and he's not a neurologist. Dr. Ehlers is board certified in physical medicine and rehabilitation. In that regard, I think it's very, very appropriate for Dr. Cohen to rely on the opinions of Dr. Delheimer, who is the only physician in this case who gave an opinion, who is a board certified spinal surgeon. He's a neurologist. He's been board certified in that field since 1984. I think that's very reasonable of Dr. Cohen, and I think that at least as far as we're balancing here direct issues of the cervical spine, I think that gives Dr. – excuse me, Dr. – I'm losing my names here. Our treating physician, I'm sorry, gives him an advantage. Dr. Delheimer, excuse me. Now, in – Aside from all of that, isn't it really up to the commission to weigh the credibility and the believability of the witnesses and to resolve the conflicts in the medical evidence? Isn't that the bottom line? Yes, it is, Your Honor. And they've done that? In my opinion, I believe they have, Your Honor. In that regard, I discussed a little bit about the FCE. I don't think – I think there's sufficient evidence in the record to support a cervical – to support the finding in regards to the cervical spine. As such, I think the TTD and the medical bills are appropriate as far as how they were awarded. Now, we're addressing the average weekly wage. I set forth in my brief Section 10 of the Act. It's pretty clear. There's essentially three methods to calculating the average weekly wage. I don't need to lecture you gentlemen on that. I'm sure you're very well aware. Now, we're in a situation here where the date of accident occurred within the 52 weeks from the date of hire. As such, the third method contained in Section 10 is appropriate. We're taking – you know, we have our earnings divided by our parts – our weeks and parts thereof. All we have is pay stubs, so we can't necessarily determine the parts thereof. We have the number of weeks, so we take the petitioner's earnings, which they've done over the 30 weeks, which I believe is appropriate, and we discuss this in the Smith case. And as such, I think the average weekly wage calculation is correct. If you have any questions, I'd be happy to answer them. Thank you, Counsel. Thank you, Your Honor. Counsel may reply. Well, I submit to you that if no causation opinions were obtained at all in this case, that it would be obvious that based upon the net complaints immediately after the accident in question to the present, that it would be obvious that the cervical condition was causal related to the work accident in question. Just because Dr. Delheimer gave the opinion he did, it doesn't mean that that could be relied on if that opinion is unreasonable. And I just – the reason why I went to such great lengths to set forth all the net complaints is just to get the attention of the court, just to see how obvious this is that it is related to it. Again, Dr. Delheimer did not even review the MRI, and yet he makes findings that normally would rely on a physician looking at the MRI that devastates the whole case, and he didn't even review the MRI. Furthermore, he indicates that there is nothing but subjective complaints in the record, and I believe that that was said by the commission as well, but yet there is objective evidence. The November 7, 2007 cervical MRI says that there's disc bulging at C23, C34, and C67 with a protrusion at C56. And Dr. – again, Dr. Delheimer did not even look at that. As far as the EMG, there was an EMG done on June 16, 2008. It indicated evidence of C7 irritability, and it says which could represent C7 nerve irritation. It does say could represent. There's also in June 2008 says patchy findings of C7 irritability, and Dr. – this is the January 7, 2009 record of Dr. Howard. He indicates that there's evidence of C56 disc disorder, and because of this we are referring him to Dr. Mulconry for further workup. That's the doctor that indicated within his records about if there's no prior history that he would attribute it to the cervical problems, to the work accident question. And Dr. Mulconry himself in his June 12, 2009 – he's the doctor that performed the surgery. In his record he says he has completed physical therapy and undergone epidural steroid injections, and EMG indicated the possibility of C7 pathology in the left upper extremity. I do believe at this point it is reasonable to consider proceeding with surgery, and then he performed the surgery on August 13, 2009. So I submit to you that there is objective findings, and to find that there is no causation between the cervical condition and the work accident question would be against the manifest way of the evidence. Thank you very much. Thank you, counsel.